# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                   No. CR 02-1055 JB

MICHAEL SEVENS MARTINEZ,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Statement and Request for Evidentiary Hearing, filed April 3, 2006 (Doc. 25)("Motion to Suppress").  The Court held a hearing on this motion on August 17, 2006.  The primary issues are: (i) whether the admission of statements that Defendant Michael Sevens Martinez made during this interview would constitute criminal trial use against Martinez of involuntary statements in violation of due process of law; (ii) whether the statements Martinez made were impermissibly obtained after Martinez invoked his right to counsel; and (iii) whether the Court should suppress statements Martinez made during a telephone call in the presence of FBI agents because they are fruits of earlier constitutional violations.  Because the Court finds that Martinez' statements were knowingly and voluntarily made, and because the Court finds that FBI agents did not improperly elicit inculpatory statements after Martinez invoked his right to counsel, the Court will deny the motion.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in

this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of

rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules

of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of

evidence, including the legality of a search or seizure and the voluntariness of an individual's

confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982).

In deciding such preliminary questions, the Court is not bound by the rules of evidence except for

those rules related to privileges.  See Fed. R. Evid. 1101(d)(1).  Thus, the Court may consider hearsay

in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

1.      On September 13, 2005, a redacted superceding indictment charged Michael Sevens

Martinez with the first degree murder of his grandmother, Joyce Ortiz, while in the commission of

aggravated sexual abuse, in violation of 18 U.S.C. §§ 1153 and 1111.  See Redacted Superceding

Indictment, filed September 13, 2005 (Doc. 2)("Indictment").

2.      The offenses are alleged to have occurred on August12, 1997 on San Juan Pueblo.

See Indictment; Motion to Suppress ¶ 1, at 1.

3.      On September 13, 2005, the Santa Clara Tribal Police Department was assisting the

FBI locate Michael Sevens Martinez.  See Motion to Suppress ¶ 2, at 1-2; United States' Response

to Motion to Suppress Statement, Filed April 3, 2006 at 2, filed May 25, 2006 (Doc.

35)("Response"); Transcript of Hearing at 31:14 - 32:20 (Romero)(taken August 17,

2006)("Transcript").[1]

4.      At approximately 8:45 p.m., Santa Clara Tribal Police Department officer, Sergeant

_____

[1]The Court's citations to the transcript of the hearing refer to the Court Reporter's original,
unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Solomon Romero, was driving toward a home he believed to be Martinez' grandfather's residence when he recognized Martinez as a passenger in a van traveling away from that location.  <u>See</u> Transcript at 31:14 - 32:20.

5.     Martinez' grandfather, Manuel Martinez, was driving the van.  <u>See</u> Motion to Suppress ¶ 3, at 2; Response at 2; Transcript at 195:13-18 (Martinez).

6.     Romero left his patrol vehicle, approached the van's passenger-side window with his gun pointed at Martinez, identified himself as a police officer with the Santa Clara Tribal Police Department, and advised Martinez that he was wanted for questioning regarding a federal investigation.  <u>See</u> Transcript at 33:4-10 (Romero); <u>id.</u> at 196:1-4 (Martinez).

7.     Romero did not provide Martinez with any information about the federal investigation or indicate to him why he was sought for questioning.  <u>See</u> <u>id.</u> at 33:23-25 (Romero).

8.     Martinez voluntarily agreed to accompany Romero to the Santa Clara Police Department to await the federal investigator.  <u>See</u> <u>id.</u> at 34:13-15 (Romero).

9.     Because of the nature of the suspected offense, Romero placed Martinez in handcuffs; because Romero's vehicle did not have a safety cage, Romero called for another law enforcement vehicle in which Martinez could be safely transported.  <u>See</u> <u>id.</u> at 35:23 - 36:1, 36:22-24 (Romero); <u>id.</u> at 196:21-22 (Martinez).

10.     Martinez was placed on the ground to await the transport vehicle.  <u>See</u> Motion to Suppress ¶ 3, at 2; Transcript at 35:3-9 (Romero).

11.     Martinez was in custody and subject to interrogation.  <u>See</u> Transcript at 196:24 - 197:1, 198:4-5, 199:5-13 (Martinez).

12.     Bureau of Indian Affairs Special Agents Marcelino ToersBijns and John Montowine

met Martinez at the Santa Clara Police Department.  ToersBijn requested that Martinez' handcuffs be removed.  See id. at 52:7-24 (ToersBijn); id. at 199:5-7 (Martinez).

13.     Martinez was told that FBI agents wished to speak to him regarding a federal investigation, and asked if he would be willing to accompany the officers to the FBI Santa Fe Resident Agency.  Martinez voluntarily agreed to accompany the officers.  See id. 52:25 - 53:5 (ToersBijns).

14.     ToersBijn and Montowine were aware of the Indictment that had been issued against Martinez, but did not arrest Martinez or describe to him the charges he faced.  See id. at 53:21-25 (ToersBijns); id. at 200:1-9 (Martinez).

15.     Martinez was concerned that he did not have a ride home and asked if he would be brought back following the interview.  Martinez was told that the FBI lead agent would determine whether he would be brought home after the interview.  See id. at 53:17-20 (ToersBijns).

16.     ToersBijns, Montowine, and Martinez then traveled in an unmarked police car from the Santa Clara Pueblo to Santa Fe.  ToersBijn drove, Martinez was seated to his right in the front passenger seat, and Montowine sat in the backseat.  See id. at 54:23 - 55:1 (ToersBijns).

17.     During the trip, the conversation was casual and did not address the nature of the charged case.  See  id. at 55:4 (ToersBijns); id. at 55:15-19 (ToersBijns).

18.     Upon arriving at the Santa Fe Resident Agency, Martinez was brought into a conference room used for meetings and presentations; no jail or other holding cell was visible.  See id. at 56:8-20 (ToersBijns); id. at 200:15-19 (Martinez).

19.     At the Santa Fe Resident Agency, FBI Special Agent Brian Wentz, the case agent, met Martinez, and explained that Wentz and ToersBijns wished to interview Martinez.  See Motion

to Suppress ¶ 5, at 2; Response at 3; Transcript at 57:11-14 (ToersBijns).

20.    Montowine and Special Agent Matthew McCullough were also present during the interview of Martinez.  See Motion to Suppress ¶ 5, at 2; Response at 3.

21.    Before the initial questioning, at 11:35 p.m., Wertz read Martinez his rights, and the agents provided Martinez with a written explanation of his rights.  See Motion to Suppress ¶ 6, at 3; Response at 3; Transcript at 58:15-18 (ToersBijns); id. at 214:14-18 (Martinez); Response, Exhibit 1, Advice of Rights ("Rights Waiver").

22.    Martinez' age, intelligence, and education are not of a level so low or impaired as to indicate an inability to voluntarily consent to an interview with law enforcement.  He is well spoken, is able to read English, and demonstrate recollection.  See Response at 8; Transcript at 190:9-19 (Wentz).  Martinez testified at the hearing on this motion, and the Court was able to observe his speaking ability, reasoning, and mental abilities.

23.    At 11:38 p.m., Martinez signed a written waiver of his rights that included a statement that he was willing to answer questions without a lawyer present.  See Motion to Suppress ¶ 6, at 3; Response at 3; Rights Waiver.

24.    Wentz and ToersBijns also signed the form.  See Response at 3; Rights Waiver.

25.    Martinez was cooperative and relaxed as questioning began.  See Transcript at 60:23-24 (ToersBijns).

26.    When asked if he recalled his grandmother, Ortiz, being murdered, Martinez stated that he knew his grandmother had been murdered and that his uncles had told him that the manner of death was asphyxiation.  See Response at 3; Transcript at 60:5-8 (ToersBijns).

27.    Martinez stated that he did not recall the night his grandmother was murdered, and

that he was probably intoxicated at that time because he had a long history of drug abuse.  <u>See</u> Motion to Suppress ¶ 7, at 3; Response at 3; Transcript at 61:5-9 (ToersBijns).

28.     Martinez denied knowing details of the homicide.  <u>See</u> Motion to Suppress ¶ 7, at 3; Response at 3.

29.     After the denial, ToersBijns told Martinez that the FBI laboratory had matched his DNA to that of the perpetrator of the offense.  <u>See</u> Motion to Suppress ¶ 7, at 3; Response at 3 Transcript at 61:14-17 (ToersBijns); <u>id.</u> at 201:7-12 (Martinez).

30.     The agents told Martinez that the question they wished to ask him was not if, but why he murdered his grandmother.  <u>See</u> Motion to Suppress ¶ 7, at 3; Response at 3; Transcript at 62:15-17 (ToersBijns).

31.     Martinez became visibly upset, asserted that his "life [was] over," and inquired whether he should obtain legal advice. <u>See</u> Motion to Suppress ¶ 8, at 3; Response at 3; Transcript at 62:25 - 63:3 (ToersBijns); <u>id.</u> at 106:3 (McCullough); <u>id.</u> at 175:15-19 (Wentz); <u>id.</u> at 201:15-17 (Martinez).

32.     Wentz told Martinez that only Martinez could make a decision regarding counsel. <u>See</u> Motion to Suppress ¶ 8, at 3; Response at 3; Transcript at 63:22-24 (ToersBijns); <u>id.</u> at 106:9-11 (McCullough).

33.     Martinez continued the conversation by inquiring why the laboratory results had taken so long, and Wentz explained how DNA of unknown offenders is retained in the hope of finding a future match.  <u>See</u> Motion to Suppress ¶ 8, at 3; Response at 3; Transcript at 64:5-16 (ToersBijns); <u>id.</u> at 215:20 - 216:7 (Martinez).

34.     Wentz inquired whether Martinez had nightmares about the murder.  <u>See</u> Motion to

Suppress ¶ 9, at 3; Response at 3; Transcript at 65:1-4 (ToersBijns).

35.    Martinez responded that he had frequent nightmares about committing evil acts and that he would sometimes wake up with blood on his body that was not his.  See Response at 3-4; Transcript at 65:10-13 (ToersBijns).

36.    The agents asked Martinez if he had any guilt for what he did to Ortiz, and he answered affirmatively.  See Response at 4; Transcript at 65:17-19 (ToersBijns).

37.    ToersBijns showed Martinez pictures of the crime scene, including a photograph of his grandmother's deceased body.  See Motion to Suppress ¶ 9, at 3; Response at 4; Transcript at 66:10 - 67:9 (ToersBijns); id. at 201:24 - 202:1 (Martinez).

38.    The agents asked Martinez if he was high when he killed his grandmother, and he responded that it was very possible.  See Response at 4; Transcript at 67:21-23 (ToersBijns); id. at 222:7-10 (Martinez).

39.    Martinez then remarked that he did not have legal advice and indicated that he should have legal advice.   See Motion to Suppress ¶ 10, at 3; Response at 4; Transcript at 68:7-14 (ToersBijns); id. at 108:18-19 (McCullough); id. at 165:24 - 166:1 (Wentz); id. at 202:9-11 (Martinez).

40.    At that point, the agents terminated Martinez' interview and placed him under arrest for the murder of Ortiz.  See Motion to Suppress ¶ 10, at 3; Response at 4; Transcript at 68:24 - 69:9 (ToersBijns); id. at 110:4-9 (McCullough); id. at 180:8-11 (Wentz); id. at 202:12-15 (Martinez).

41.    At no time during Martinez' interview at the Santa Fe Resident Agency did any of the law enforcement officers ask Martinez if he wanted a lawyer to be present.  See Transcript at 93:8-11, 95:15-17 (ToersBijns); id. at 127:23-25 (McCullough); id. at 164:8-10 (Wentz).

-7-

42.     Martinez then asked, for the first of several times, how much time he faced in prison. See Motion to Suppress ¶ 10, at 3; Response at 4; Transcript at 98:9-10 (ToersBijns); id. at 203:10-13 (Martinez).

43.     After the arrest, the agents placed Martinez in Wentz' FBI vehicle for transport to the jailing facility in Albuquerque.  Wentz and McCullough accompanied Martinez to Albuquerque. Wentz drove the car, and McCullough was seated in the backseat next to Martinez.  See Motion to Suppress ¶ 12, at 4; Response at 4; Transcript at 110:10-18 (McCullough).

44.     During the drive from the Santa Fe Resident Agency to Albuquerque, Martinez requested that he be allowed to make a telephone call to his girlfriend.  See Transcript at 211:21-25 (Martinez).

45.     During the drive to Albuquerque, Martinez continued to question the agents about the potential duration of his imprisonment.   See Response at 4; Transcript at 111:16-18 (McCullough); id. at 205:23 - 206:2 (Martinez).

46.   McCullough told Martinez that there were many variables to sentences, including acceptance of responsibility, criminal history, and a willingness to cooperate.  See Response at 4; Transcript at 111:23 - 112:1 (McCullough); id. at 217:5-16 (Martinez).

47.     Martinez asked Wertz and McCullough if he would have another opportunity to speak to the FBI after he met with a lawyer, and the agents indicated to him that they had no intention of speaking to him any further about the murder. See Motion to Suppress ¶ 12, at 4; Response at 4-5; Transcript at 113:14-16 (McCullough); id. at 206:15-17 (Martinez).

48.     After the agents told Martinez that they would not talk to him about the murder, Martinez asked if he might get less time in prison if he talked.  The agents indicated that they could

not make any guarantees, but that his efforts to accept responsibility might be considered when and if a sentence was imposed.  See Motion to Suppress ¶ 12, at 4; Response at 5; Transcript at 114:2-5 (McCullough); id. at 142:7-13 (McCullough); id. at 185:2-4 (Wentz).

49.     Martinez suggested that he might wish to continue his conversation about the homicide and asked again whether that would help him from the standpoint of incarceration length. See Motion to Suppress ¶ 13, at 4; Response at 5; Transcript at 114:13-14 (McCullough).

50.     McCullough told Martinez that, before any conversation continued, Martinez needed to make a final decision about an attorney.  See Motion to Suppress ¶ 13, at 4; Response at 5; Transcript at 137:11-14 (McCullough).

51.     The agents told Martinez to think about whether he wished to continue talking for the remainder of the drive to Albuquerque and that, if he decided he wished to waive his right to an attorney, the conversation could be continued at the Albuquerque FBI office.  See Motion to Suppress ¶ 13, at 4; Response at 5; Transcript at 114:16-23 (McCullough); id. at 169:11-23 (Wentz).

52.     A long portion of the remainder of the trip passed in silence. See Motion to Suppress ¶ 14, at 4; Response at 5; Transcript at 114:25 - 115:1 (McCullough).

53.     When they were near the FBI office, Wentz asked Martinez if he wished to talk. Martinez responded that he wished to tell the agents what happened, and the agents took him to the Albuquerque FBI office. See Motion to Suppress ¶ 14, at 4; Response at 5; Transcript at 116:14-18 (McCullough).

54.     McCullough told Martinez that, if he wanted to speak to the agents, they needed a written statement indicating that he understood his rights and that he was willing to speak.  See Response at 5; Transcript at 118:17-20 (McCullough).

55.     The agents provided Martinez with a sheet of paper and a pen, and he wrote and signed the following statement: "I, Michael S. Martinez am speaking on my own free will about the murder and rape of Joyce Ortiz. I have been guaranteed no promises and am not being forced. I understand my rights." The statement was dated "9.14.04 [at] 1:45am." Response, Exhibit 2. See Motion to Suppress ¶ 15, at 5; Response at 5; Transcript 119:15-22 (McCullough); id. at 207:7-10 (Martinez).

56.     Martinez stated that he had consumed alcohol and narcotics on the night of Ortiz' murder, and that he had gone to Ortiz' home to search for marijuana. See Response at 5; Transcript at 120:12-21 (McCullough).

57.     Martinez admitted to the agents that he had choked Ortiz to death and that he had raped her. See Response at 5; Transcript at 121:3-14 (McCullough).

58.     After interviewing Martinez at the Albuquerque FBI office, Wentz and McCullough drove Martinez to the regional detention center to be deposited for the evening. During the drive to the detention center, the agents allowed Martinez to make a call to his girlfriend from Wentz' cellular telephone. See Motion to Suppress ¶ 16, at 5; Response at 6; Transcript at 156:4-8 (McCullough).

59.     During his conversation with his girlfriend, Martinez made further admissions concerning the homicide and explained to her that he had previously wanted to tell her the truth about this event. See Motion to Suppress ¶ 17, at 5; Response at 6; Transcript at 154:1-21 (McCullough).

60.     Agents were able to hear Martinez' girlfriend crying hysterically. See Response at 6; Transcript at 155:19-20 (McCullough).

-10-

61.     Agents heard Martinez telling his girlfriend that it was his grandmother he killed and that he had also raped her. See Response at 6; Transcript at 156:11-13 (McCullough); id. at 172:24-25 (Wentz); id. at 211:11-13 (Martinez).

62.     No officer involved in the interviews of Martinez made any promise of leniency. See Transcript at 209:22-24 (Martinez).

## PROCEDURAL BACKGROUND

On September 13, 2005, a redacted superceding indictment charged Martinez with the first-degree murder of his grandmother while in the commission of an aggravated sexual abuse, in violation of 18 U.S.C. §§ 1153 and 1111. See Indictment. The United States intends to offer at trial each statement that Martinez made during his presence with law enforcement.

Martinez moves the Court, pursuant to rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure and the Fifth and Sixth Amendments to the United States Constitution, to suppress statements he made to law enforcement investigators. See Motion to Suppress at 1. He also requests the Court hold an evidentiary hearing on his motion. See id. The Court held an evidentiary hearing on this motion on August 17, 2006.

## LAW REGARDING VOLUNTARINESS OF STATEMENTS

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." The Due Process Clause requires that, to be admissible, a defendant's statements must have been made voluntarily. See Dickerson v. United States, 530 U.S. 428, 433 (2000)("Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth

Amendment.")(citing <u>Brown v. Mississippi</u>, 297 U.S. 278 (1936), and <u>Bram v. United States</u>, 168 U.S. 532, 542 (1897));  <u>Jackson v. Denno</u>, 378 U.S. 368, 376 (1964)("It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, and even though there is ample evidence aside from the confession to support the conviction.") (citations omitted).

The Supreme Court of the United States has declared that a defendant has the constitutional right "at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness." <u>Jackson v. Denno</u>, 378 U.S. at 376-77 (citation omitted).  The United States must show that the statement was voluntary by a preponderance of the evidence.  <u>See</u> <u>Missouri v. Seibert</u>, 542 U.S. 600, 608 n.1 (2004); <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972)("[T]he prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."); <u>United States v. McCullah</u>, 76 F.3d 1087, 1100 (10th Cir.)("The prosecution has the burden of proving by at least a preponderance of evidence that the confession was voluntary.")(citation omitted), <u>reh'g</u> <u>denied</u>, 87 F.3d 1136 (10th Cir. 1996).

The due process voluntariness test examines "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." <u>Dickerson v. United States</u>, 530 U.S. at 434 (internal quotations omitted)(quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973)). "The due process test takes into consideration the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." <u>Id.</u> (internal quotations and citations omitted).  The Court must weigh "the circumstances of pressure against the power of resistance of the person confessing." <u>Id.</u> (internal quotations omitted)(quoting <u>Stein v. New York</u>,

-12-

346 U.S. 156, 185 (1953)).  The Supreme Court has reaffirmed this analysis as recently as 2000.  <u>See</u> <u>id.</u> ("We have never abandoned this due process jurisprudence, and thus continue to exclude confessions that were obtained involuntarily.").

The Supreme Court has instructed that, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." <u>Colorado v. Connelly</u>, 479 U.S. 157, 164 (1986).  In reviewing its cases in which it suppressed evidence, the Supreme Court has recognized that "all have contained a substantial element of coercive police conduct." <u>Id.</u>  The Supreme Court has made clear that, "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." <u>Id.</u> at 165.  The Supreme Court has explained that any other rule "would expand our previous line of 'voluntariness' cases into a far-ranging requirement that courts must divine a defendant's motivation for speaking or acting as he did even though there be no claim that governmental conduct coerced his decision." <u>Id.</u>  at 165-66.

## RELEVANT LAW REGARDING INTERROGATION

Law enforcement must give the four <u>Miranda</u> warnings to a person subject to "custodial interrogation." <u>United States v. Hudson</u>, 210 F.3d 1184, 1190 (10th Cir. 2000)(citing <u>Miranda v. Arizona</u>, 384 U.S. at 444)(internal quotations omitted).  A person is in custody if "his freedom of action is curtailed to a degree associated with formal arrest." <u>Id.</u> (citing <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984))(internal quotations omitted).  The Court must examine "whether a reasonable [person] in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest." <u>Id.</u> (alteration in original)(internal quotations and citations omitted).  The Tenth

Circuit has articulated the "[t]wo discrete inquiries . . . essential to the determination" of custody: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."  United States v. Erving L., 147 F.3d 1240, 1245 (10th Cir. 1998).

    **1. Custodial Setting.**

    The Supreme Court has described the determination whether a suspect is "in custody" as a "mixed question of law and fact." Thompson v. Keohane, 516 U.S. 99, 101 (1995).  Because of its nature as a mixed question, and because the Miranda decision did not provide the Court with an opportunity to answer that question within the context of a specific set of facts, see Yarborough v. Alvarado, 541 U.S. 652, 661 (2004), the resolution of this question requires a case-by-case analysis. In making a custody determination, courts must consider a wide array of "diverse and case-specific factors in an effort to gain an overall sense of the defendant's situation at the time of the interrogation." Thompson v. Keohane, 516 U.S. at 118 (Thomas, J., dissenting).

> These factors include, at a minimum, the location, timing, and length of the interview, the nature and tone of the questioning, whether the defendant came to the place of questioning  voluntarily, the use of physical contact or physical restraint, and the demeanor of all of the key players, both during the interview and in any proceedings held in court.

Id.  See Yarborough v. Alvarado, 541 U.S. at 664-65 (outlining factors for and against a custody determination).  In reaching a conclusion, none of these factors is dispositive, and the underlying emphasis is always on the degree to which the suspects' freedom has been curtailed.  See Oregon v. Mathiason, 429 U.S. 492, 495 (1977) ("Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.  Miranda warnings are required only where there has been such a

-14-

restriction on a person's freedom as to render him 'in custody.'").

Courts employ an objective test in making custody determinations and therefore "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. at 442. See Stansbury v. California, 511 U.S. 318, 323 ( 1994) ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.").  The Supreme Court has indicated that it favors an objective test, as opposed to a subjective test, because an objective test "is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question." Berkemer v. McCarty, 468 U.S. at 442, n.35 (quoting People v. P., 21 N.Y.2d 1, 9-10, 233 N.E.2d 255, 260 (1967)).

Pursuant to this understanding, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have held that an individual is not "in custody" for Miranda purposes simply because the individual is the target of an investigation or a suspect in a crime.  See, e.g., Stansbury v. California, 511 U.S. at 319 ("We hold, not for the first time, that an officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment whether the person is in custody."); United States v. Leach, 749 F.2d 592, 599-600 (10th Cir. 1984) (refusing to classify defendant as "in custody" merely because he was the target of a counterfeit note investigation).  For an individual's status as a suspect to be relevant, the questioning officer must convey his knowledge or belief with regard to that status, by word or deed, in such a manner as to "affect how a reasonable person in the position of the individual being

questioned would gauge the breadth of his or her 'freedom of action.'" Stansbury v. California, 511 U.S. at 325.

### 2. **Custodial Interrogation.**

A finding of custody, by itself, does not make a statement inadmissible. The Supreme Court in Miranda v. Arizona specifically preserved the propriety of confessions in American law enforcement and stated: "Any statement given freely and voluntarily without compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." Miranda v. Arizona, 384 U.S. at 478. Accordingly, custodial statements are only inadmissible when they are improperly compelled or coerced through either "express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). In other words, it is not custody that requires Miranda protections, but rather custodial interrogation. See id. at 300 ("'Interrogation,' as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.").

It is well settled that "any criminal trial use against a defendant of his involuntary statement is a denial of due process of law." Mincey v. Arizona, 437 U.S. 385, 398 (1978)(emphasis in original). While some statements procured while a defendant is in custody may be the product of involuntary coercion, many are attributable to other factors. See Culombe v. Connecticut, 367 U.S. 568, 576 (1961)("[A] confession made by a person in custody is not always the result of an overborne will. The police may be midwife to a declaration naturally born of remorse, or relief, or desperation, or calculation."). Similar to the custody test, the determination whether a statement is voluntary or involuntary involves a totality-of-the-circumstances approach requiring "more than a

mere color-matching of cases," <u>Mincey v. Arizona</u>, 437 U.S. at 401 (quoting <u>Reck v. Pate</u>, 367 U.S. 433, 442 (1961)), but rather a "careful evaluation of all the circumstances of the interrogation." <u>Mincey v. Arizona</u>, 437 U.S. at 401.

To assist the courts' efforts in determining whether a statement was voluntarily given, the Supreme Court has divided the analysis into three parts.  First, the court must compile the facts relevant to understanding the circumstances under which the confession was given.  <u>See</u> <u>Culombe v. Connecticut</u>, 367 U.S. at 603.  Among the facts the court must consider in this step are "the duration and conditions of detention (if the confessor has been detained), the manifest attitude of the police toward him, his physical and mental state, [and] the diverse pressures which sap or sustain his powers of resistance and self-control."[2]  <u>Id.</u> at 602.  Second, the court must evaluate how the accused reacted to these underlying circumstances.  <u>See id.</u> at 603.  Third, the court must determine the legal significance of the accused's reaction to the circumstances.  <u>See id.</u>  With reference to the second and third parts of the analysis, the Supreme Court has acknowledged that, "although distinct as a matter of abstract analysis, [parts two and three] become in practical operation inextricably interwoven."  <u>Id.</u> at 604.

---

[2]The Tenth Circuit has recently enumerated its own list of facts relevant to a determination whether a statement was voluntarily made.  In <u>United States v. Lopez</u>, 437 F.3d 1059 (10th Cir. 2006), the Tenth Circuit stated:

> Relevant circumstances embrace both the characteristics of the accused and the details of the interrogation.  Such factors include (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment.

<u>Id.</u> at 1063-64 (quoting <u>United States v. Toles</u>, 297 F.3d 959, 966 (10th Cir. 2002)).

3.      **Request for counsel**.

Before interrogating officers are required to discontinue questioning a criminal suspect, the suspect must make a clear statement that "at a minimum, . . . can reasonably be construed to be an expression of a desire for the assistance of an attorney." Davis v. United States, 512 U.S. 452, 459 (1994)(quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)).  The Supreme Court has stated that, when a "suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." Id. (emphasis in original). See Moran v. Burbine, 475 U.S. 412, 433 n.4 (1986)("[T]he interrogation must cease until an attorney is present only if the individual states that he wants an attorney.")(internal quotations and alterations omitted); LaFevers v. Gibson, 182 F.3d 705, 713 (10th Cir. 1999)(quoting Davis v. United States).  Furthermore, when a suspect makes an ambiguous statement regarding his desire for counsel, law enforcement officers are encouraged, but not required, to ask clarifying questions.

> [W]hen a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. . . . Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.

Davis v. United States, 512 U.S. at 461-62.  The Supreme Court has stated that requiring officers to cease questioning when they reasonably do not know whether a suspect wants an attorney present "would transform the Miranda safeguards into wholly irrational obstacles to legitimate police

-18-

investigative activity."  Id. at 460 (quoting Michigan v. Mosley, 423 U.S. 96, 102 (1975)).

**4.      Reinitiation of Conversation with Police After Invocation of Rights.**

When a suspect has unambiguously invoked his right to counsel, "it is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody." Edwards v. Arizona, 451 U.S. 477, 485 (1981).  At this point, "a valid waiver of that right [to counsel] cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Minnick v. Mississippi, 498 U.S. 146, 150 (1990).  This prophylactic rule ensures that any subsequently made statement is not the result of interrogating officers' coercion and is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." Michigan v. Harvey, 494 U.S. 344, 350 (1990).

The prohibition against further questioning is not unconditional, however, as "[t]he accused . . . may voluntarily waive his Fifth Amendment rights after invoking the right to counsel if he initiates contact or discussion with authorities." United States v. Morris, 42 Fed. Appx. 223, 228 (10th Cir. 2002).  See Minnick v. Mississippi, 498 U.S. at 156 ("Edwards does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities."); United States v. Alexander, 447 F.3d 1290, 1294 (10th Cir. 2006)("Simply stated, a defendant -- even if he has asserted the right to counsel -- may choose to reinitiate contact with the police so long as the government does not coerce him into doing so.").  Neither the Fifth nor the Fourteenth Amendment "prohibit[s law enforcement] from merely listening to an arrestee's voluntary, volunteered statements and using them against him at trial." United States v. Glover, 104 F.3d 1570, 1581 (10th Cir. 1997)(quoting Edwards v. Arizona, 451 U.S. at 485).

<u>ANALYSIS</u>

Martinez argues that the statements and admissions he made to law enforcement officers on the evening of September 13, 2005 and early morning hours of September 14, 2005, were involuntary and are therefore inadmissible at the trial of this case.  <u>See</u> Motion to Suppress at 5-9. He contends he made these statements in response to the officers' coercive statements and conduct. <u>See</u> <u>id</u>.  Martinez also alleges that he made these admissions during questioning that persisted after he unequivocally invoked his Sixth Amendment right to counsel.  <u>See</u> <u>id.</u> at 9-12.  Finally, Martinez argues that the Court should suppress the admissions that he made during a telephone call in the presence of FBI officers, because they are the fruits of the officers' alleged earlier constitutional violations.  <u>See</u> <u>id.</u> at 12-14.

Because the Court finds that Martinez' statements were knowingly and voluntarily made, and because the Court finds that the agents did not improperly elicit inculpatory statements after Martinez invoked his right to counsel, the Court disagrees with Martinez.  The law enforcement officers did not act unconstitutionally, and there is no constitutional barricade to the contested evidence's admissibility.

**I.      MARTINEZ WAS IN CUSTODY WHEN HE MADE THE STATEMENTS THAT THE UNITED STATES SEEKS TO INTRODUCE.**

There are indicia of a consensual encounter between law enforcement and Martinez:  (i) the officers' actions and demeanor; and (ii) Martinez' willingness to cooperate with the officers and answer their questions.  On the other hand, Martinez' testimony indicates that he believed himself to be in custody and that he was not free to leave.  <u>See</u> Transcript at 196:24 - 197:1; <u>id.</u> at 198:4-5; <u>id.</u> at 199:5-13 (Martinez).  Nevertheless, for purposes of this motion, the United States concedes

that Martinez was in custody, even when he was not restrained.  <u>See</u> Response at 7.  The United States concedes that Martinez was not free to leave.  <u>See id.</u>  Because Martinez was in custody and was subject to interrogation, <u>Miranda</u> warnings, and an appropriate waiver of his rights, were necessary to ensure that law enforcement constitutionally acquired the admissions.

## II.   THE LAW ENFORCEMENT OFFICERS DID NOT IMPROPERLY QUESTION MARTINEZ AFTER HE UNEQUIVOCALLY EXPRESSED HIS DESIRE TO HAVE AN ATTORNEY PRESENT.

Martinez referenced the possibility of consulting an attorney on two separate occasions during the evening in question.  Martinez' first statement, an inquiry whether he might need a lawyer, was not an unequivocal expression of his desire to have an attorney present.  The interrogating officers considered his second statement, an indication that he should have legal advice, as such an expression and ceased law-enforcement initiated questioning at that point.  Because Martinez voluntarily initiated any questioning that occurred after he invoked his right to counsel, his Fifth Amendment rights were not violated and his statements and admissions are admissible.

Martinez' first statement -- an inquiry whether he might need a lawyer -- was not an unequivocal assertion of his right to counsel.  Such a statement is not a clear invocation of the right to counsel, or an unambiguous assertion that Martinez wished to consult with an attorney.  In any case, the interviewing agents did not disregard Martinez' statement.  Instead, the agents acknowledged Martinez' concern, and Wentz told Martinez that only he could decide whether he needed to retain a lawyer.  The agents did not immediately resume questioning Martinez before he could make a reasoned, thought out decision whether he wished to have counsel present.  Moreover, within a few seconds of referencing legal assistance, Martinez, without provocation, questioned the agents with regard to why it had taken law enforcement so long to match his DNA to the DNA found

-21-

on the victim in this case.  Martinez' inquiry was not a categorical request for counsel's assistance, the agents gave him an opportunity to consider and clarify his request, and he reinitiated conversation with the agents.  Martinez' first reference to legal assistance cannot be considered a request for counsel.

Martinez' second invocation was more significant.  Martinez remarked that he did not have legal advice and that he should have legal advice.  Assuming, without deciding, that this statement was an unequivocal statement that he desired to consult with a lawyer, the Court acknowledges that the questioning agents considered this statement to be an unambiguous assertion of Martinez' Sixth Amendment right to counsel and properly ceased questioning him at that point.

Although the agents discontinued questioning him, Martinez continued to speak to the agents, asking them about the possible sentences he might face.  Rather than attempt to reinitiate interrogation, Wentz and McCullough encouraged Martinez to remain quiet and to reflect on whether he wished to continue to talk to law enforcement, and instructed him that he would need to make a decision regarding whether he wished to consult with an attorney before they would speak with him again.  See Motion to Suppress ¶ 13, at 4.  The agents were not prohibited from re-engaging with Martinez when they ceased questioning him after he invoked his right to counsel, reminded him of his right to counsel when he continued to ask whether talking to law enforcement might strengthen his position, and he voluntarily initiated further discussion with the agents.  See United States v. Morris, 42 Fed. Appx. at 228.

## III.   **MARTINEZ' STATEMENTS WERE VOLUNTARY.**

Where, as here, Martinez challenges his confession as being the product of involuntary coercion, the Court's duty is "to examine the entire record and make an independent determination

of the ultimate issue of voluntariness." United States v. Glover, 104 F.3d at 1579.  The United States must prove by a preponderance of the evidence that Martinez' statements were made voluntarily. See Missouri v. Seibert, 542 U.S. at 608 n.1.  To assist district courts in this evaluation, the Tenth Circuit has promulgated five factors that the Court will consider in this case: (i) Martinez' age, intelligence, and level of education; (ii) the total amount of time Martinez was detained; (iii) the length and nature of the agents' questioning; (iv) whether Martinez was advised of his constitutional rights; and (v) whether Martinez was subjected to any physical punishment.  See United States v. Minjares-Alvarez, 264 F.3d 980, 984-85 (10th Cir. 2001); United States v. Glover, 104 F.3d at 1579 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).

There is nothing in the record that indicates that Martinez was unable to understand his rights because of his age, intelligence, or level of education.  Wentz testified that, before Martinez signed the waiver of his rights, the agents discussed the waiver with him, and that Martinez acknowledged that he understood them, and, in fact, asked questions regarding his rights.  See Transcript at 190:9-19 (Wentz).  Moreover, the Court had the opportunity to observe Martinez and listen to him testify at the evidentiary hearing on this motion, and finds that he is well-spoken, cogent, and that, despite his substance abuse history, is able to demonstrate recollection.

Neither the length of Martinez' detention, nor the length and nature of his questioning, counsel a finding that Martinez' statements were given involuntarily.  Romero confronted and apprehended Martinez at approximately 8:45 p.m. on September 13, 2005, and Martinez wrote and signed the statement acknowledging that he was willing to speak to Wentz and McCullough at 1:45 a.m. on September 14, 2005 -- a period of five hours.  During much of that time, he was not subject to any questioning.  The agents did not question him with regard to his grandmother's murder until

after he signed the written waiver of his Miranda rights at 11:38 p.m., and Martinez acknowledges that "[a] long portion" of the approximately one-hour trip from the Santa Fe Resident Agency to Albuquerque passed in silence. Based on Martinez' representations, the Court notes that the officers could not have interrogated him for much longer than two hours in total. Finally, once in the custody of federal authorities, before being arrested, Martinez was not handcuffed or otherwise restrained, and the questioning took place in an office conference room that law enforcement staff used for meetings and presentations.

Martinez argues that officers' promises of leniency in exchange for his admissions coerced him into confessing. The record, however, indicates otherwise. Each time Martinez asked the agents about the amount of time that he might face if convicted, or if speaking to authorities could help him, the agents indicated to him that they could not make him any promises, that sentencing considerations were the prerogative of the prosecutor and the judge, and that a number of factors typically were considered in making sentencing decisions. More important, as the evening progressed, the agents encouraged Martinez to think about whether he wished to speak to them any further, reminded him that he had the option of speaking to an attorney before speaking to agents, and, through his handwritten statement composed at the Albuquerque FBI office, had him reaffirm that he understood his rights and that nothing had been promised to him.

Martinez does not deny that the agents advised him of his Miranda rights, or that he signed a written waiver of those rights before the agents interviewed him regarding the murder of his grandmother. His handwritten statement, written at approximately 1:45 a.m., indicates that he understood his rights, that he was speaking of his own free will, and that no promises had been made to him. Finally, although Martinez asserted in his motion that Romero pointed his gun at Martinez

when he first apprehended him and pushed him to the ground while he waited for a vehicle suitable

to transport Martinez, Martinez does not assert that Romero, or any other police officer or federal

agent, subjected him to physical punishment.

In short, each factor that the Tenth Circuit has identified as being relevant to the Court's

evaluation of voluntariness counsels a finding of propriety under the Fifth Amendment.  In light of

the brief amount of time that Martinez had been in custody when he made his confession, the neutral

content of the agents' answers to Martinez' questions, and the precautions the agents took to make

certain that Martinez understood his rights, the Court does not believe that the length or nature of

Martinez' detention and questioning was overly coercive or induced Martinez into making an

involuntary confession.  The United States has shown, by a preponderance of the evidence, that all

statements he made were voluntary.  The Court will allow the United States to admit the statements

against Martinez at trial.

## IV.    MARTINEZ' STATEMENTS DURING THE TELEPHONE CALL IN THE PRESENCE OF FBI AGENTS WERE NOT THE FRUITS OF EARLIER CONSTITUTIONAL VIOLATIONS.

In addition to the confessional statements he made directly to law enforcement officers,

Martinez seeks to suppress inculpatory statements that he made during a telephone call to his

girlfriend in the presence of FBI agents.  Martinez argues that "the agents manipulated and controlled

the situation in this case when they gave Mr. Martinez a telephone and had him call his girlfriend

right on the heels of his confession at the FBI office."   Motion to Suppress at 13-14.   Martinez

contends that this call was "part of the same course of action in which, during the preceding five

hours, [the agents] violated Mr. Martinez' request for counsel and obtained from him an involuntary

confession." Id. at 14.  Martinez concludes that "[t]he inculpatory statement the agents heard Mr. Martinez make was the fruit of the earlier confession, and must be suppressed." Id.

At the hearing on this motion, Martinez testified that, on at least two occasions, he requested that he be allowed to call his girlfriend.  He stated that, while waiting for the federal agents to arrive at the Santa Clara Police Department, his girlfriend had called the Department to inquire about his status, and that Romero had indicated to her that he would have Martinez call her when the federal agents were done with him.  See Transcript at 211:10-13 (Martinez).  Martinez stated that he asked Romero for permission to call her at that time, and that Romero had indicated to Martinez that he could call his girlfriend when the federal agents were through with him.  See id. at 211:15-20 (Martinez).  Martinez also stated that, during the drive from Santa Fe to Albuquerque, he asked Wentz and McCullough for permission to make a phone call.  See id. at 211:21-25 (Martinez).

Martinez argues that the inculpatory statements he made during the telephone call to his girlfriend resulted from the agents' implication that his girlfriend would support him if he cooperated.  See Motion to Suppress ¶ 16, at 5.  At the hearing on this motion, he testified that the officers suggested that it would be better if his girlfriend learned of his crime from him, as opposed to through the media.  See Transcript at 211:2-5.

Martinez does not argue, however, that the officers made any representations that Martinez' legal position could be improved through calling his girlfriend.  Nor does he deny that he was not permitted to call his girlfriend until after he had already confessed to the murder and rape of his grandmother.  Martinez merely asserts that the statements were the product of the agents' earlier unconstitutional tactics.

Given Martinez' affirmative requests to call his girlfriend, that Martinez had already confessed at the time the officers allowed him to call his girlfriend, and the lack of any evidence that the officers promised Martinez any legal advantage from making the call, the Court does not believe that any statements Martinez made during the call can be attributed to undue coercion or other unconstitutional action.  More important, because the Court has already concluded that the federal agents did not violate Martinez' Sixth Amendment right to counsel, or improperly induce him to make an involuntary confession, the Court need not address Martinez' argument that the admissions made during the phone call were the product of the agents' earlier constitutional violations.  The statements that Martinez made during the phone call to his girlfriend are not the fruit of the poisonous tree and are admissible.

The Court concludes that the entirety of the custodial interview was constitutionally proper.  Martinez was properly alerted to his constitutional rights, and knowingly and voluntarily waived them.  Martinez is not entitled to the remedy that he now seeks.  The Court will not suppress the evidence that the United States seeks to admit at trial.

**IT IS ORDERED** that the Defendant's Motion to Suppress Statement is denied.  The evidence that the United States wished to present will be admissible at trial.

_____
UNITED STATES DISTRICT JUDGE

-27-

*Counsel:*

David C. Iglesias
   United States Attorney
J. Miles Hanisee
   Assistant United States Attorney
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Susan Bronstein Duleavy
   Assistant Federal Public Defender
Albuquerque, New Mexico

       *Attorney for the Defendant*